## DEROUNIAN v. STOKES.
### No. 3526.

Circuit Court of Appeals, Tenth Circuit.
May 11, 1948.

B. E. Roberts and Parnell Black, both of Salt Lake City, Utah (Calvin W. Rawlings, H. E. Wallace, and Wayne L. Black, all of Salt Lake City, Utah, on the brief), for appellant.

Knox Patterson, of Salt Lake City, Utah (Parley Jenson, of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

J. H. McKnight, Ernest Hollings, C. F. Allen, and Jeremiah Stokes instituted separate actions against Arthur Derounian to recover damages for the publication of alleged libelous matter in the book "Under Cover". The second amended complaint in the case filed by Stokes was in conventional form and quoted at length from the book; and the defenses in that case were truth, privilege, and want of malice. The four cases were consolidated for trial. McKnight, Hollings, and Allen failed before the jury. A verdict was returned in favor of Stokes; judgment was entered upon the verdict; and Derounian appealed. For convenience, the parties will be referred to as they appeared in the trial court.

One ground of the motion for a directed verdict in favor of the defendant was that the statements contained in the book having reference to plaintiff were true. It is the law in Utah as elsewhere that the truth of matters charged as defamatory exempts the publisher thereof from civil liability for libel. Williams v. Standard-Examiner Publishing Co., 83 Utah 31, 27 P. 2d 1. We do not pause to quote from the book or to review in detail other evidence adduced at the trial. At most, the evidence and its reasonable inferences merely presented the issue of fact whether the statements in the book relating to plaintiff were true. Therefore, insofar as the defense of truth was concerned, the court correctly denied the motion for a directed verdict and submitted the issue to the jury.

The essence of a requested instruction which the court refused was that if the book contained language which, taken in its plain and natural import and meaning, necessarily must or presumably would as its proximate consequence occasion plaintiffs, respectively, pecuniary loss, its publication was libelous; that the burden rested upon plaintiffs to prove by a preponderance of the evidence that such publication was libelous; that if the evidence was evenly balanced or if it preponderated in favor of the defendant, the verdict in each case should be for the defendant; and that if the material contained in the book concerning plaintiffs was libelous, then the burden rested

upon the defendant to prove its truth. It may be conceded that the instruction constituted an accurate statement of the applicable law in Utah. Nichols v. Daily Reporter Co., 30 Utah 74, 83 P. 573, 3 L.R.A., N.S., 339, 116 Am.St.Rep. 796, 8 Ann.Cas. 841. But the general instructions of the court stated in different language and with substantial correctness the general principles of pertinent law outlined in the requested instruction. And we have held repeatedly that it is not error for the court to refuse a requested instruction even though correct in substance if the matter has been fairly and adequately covered in the general instructions given. Bowater v. Worley, 10 Cir., 57 F.2d 970; Detroit Fire & Marine Insurance Co. v. Oklahoma Terminal Elevator Co., 10 Cir., 64 F.2d 671; George v. Wiseman, 10 Cir., 98 F.2d 923; Metropolitan Life Insurance Co. v. Banion, 10 Cir., 106 F.2d 561; Mid-Continent Pipe Line Co. v. Whiteley, 10 Cir., 116 F.2d 871; Brigham Young University v. Lillywhite, 10 Cir., 118 F.2d 836, 137 A.L.R. 598, certiorari denied 314 U.S. 638, 62 S.Ct. 73, 86 L.Ed. 512; Dyess v. W. W. Clyde & Co., 10 Cir., 132 F.2d 972; Telluride Power Co. v. Williams, 10 Cir., 164 F.2d 685.

Coming to the contention that the alleged libelous publication was privileged, at the close of all the evidence the defendant moved the court to direct the jury to return a verdict in his favor on the ground that the book generally and that part relating to the plaintiff was a publication fairly made in good faith, for proper motives, and for justifiable ends upon a matter of public interest. And the substance of a requested instruction refused by the court was that a publication made in good faith upon a matter of public interest and concerning or involving public welfare in time of war is privileged, even though without such privilege it would be actionable; that the privilege exists even though the author was under no legal duty to have the matter published; that if the matter published in the book concerning the plaintiffs was privileged, a verdict should be returned for the defendant unless the defendant was actuated by malice towards the plaintiffs in writing the book; and that if the material in the book was privileged, the burden rested upon

the plaintiffs to establish by a preponderance of the evidence that the defendant was actuated by malice toward the plaintiffs in writing the statements in the book. In Williams v. Standard-Examiner Publishing Co., supra, it was held that in Utah privileged communications are two classes, absolute, and qualified or conditional; that in the case of an absolutely privileged communication the utterance or publication, although both false and malicious, does not give rise to a cause of action; that in the case of a qualified or conditionally privileged communication the law raises merely a prima facie presumption in favor of the occasion; that both classes of privileged communications rest upon grounds of public policy, the necessity of the individual to surrender his personal rights for the common welfare; that the rule of a qualifiedly privileged communication extends to a communication made bona fide upon a subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and that the privilege includes cases where the duty is not one arising out of law, but is of a moral or social character. The cause of action there asserted was predicated upon an article in a local newspaper criticizing a city commissioner in charge of the water department of the city for furnishing contaminated water to the public which brought about an existing or a threatened epidemic of typhoid fever, and it was held that the publication was qualifiedly or conditionally privileged. Here, plaintiff was engaged in the practice of law in Salt Lake City, Utah. He was a member of the Mormon church, and he had filled various positions in the church. Beginning in 1933, he wrote and caused to be published and circulated from time to time various tracts and pamphlets, and on one occasion he delivered a public address in Denver, Colorado. While he sometimes severely criticized the President of the United States, sometimes severely criticized certain other public officials, and sometimes severely criticized certain proposed or existing legislation, the gist of his writings and of the address referred to was primarily a denunciation of communism in the United States. After graduating in journalism from a recognized university, the defendant worked for certain newspapers and magazines, and he later wrote the book. The book was published in 1943, during the time the United States was engaged in war against Germany, Italy, and Japan. The general pattern of the book was to expose the pro-Nazi and the pro-Fascist elements in the United States. Many persons in various parts of the nation were named, were sometimes referred to as quislings or in other words of similar descriptive import, were classified as being disloyal to the United States, and were depicted as plotting its overthrow. Plaintiffs and others in Salt Lake City were mentioned by name; reference was made to the "Mormon City fascist cell"; and statements attributed to plaintiff were quoted which bore earmarks of disloyalty. While our attention has not been called to any language in the book stating specifically and categorically that plaintiff was pro-Nazi, or pro-Fascist, or that he was disloyal to the United States, the statements referring directly to him were clearly and certainly susceptible of that construction when read in connection with the entire book. And taking into consideration the conditions existing at the time of the publication of the book, particularly the contemporary antipathy toward the Nazi regime in Germany and the Fascist regime in Italy, the false charge or characterization of an American citizen of good character and reputation as a pro-Nazi or a pro-Fascist, or as being disloyal to the United States, was reasonably calculated to subject him to public hatred, odium, and contempt, and therefore constituted libel per se. Grant v. Reader's Digest Association, 2 Cir., 151 F.2d 733, certiorari denied 326 U. S. 797, 66 S.Ct. 492, 90 L.Ed. 485; Spanel v. Pegler, 7 Cir., 160 F.2d 619, 171 A.L.R. 699; Mencher v. Chesley, 297 N.Y. 94, 75 N.E.2d 257.

■ Plaintiff was not a public official, and he was not a candidate for public office. He did not hold a managerial position in a public institution, national, state, or municipal. And he was not otherwise connected with a public enterprise involving public welfare. He was a private citizen. His tracts and pamphlets, and his public address,

or addresses, as well as his private character or conduct insofar as it affected his public conduct, were subject to comment and criticism even though severe and hostile, provided it contained no misstatement of material fact concerning such tracts, pamphlets, or addresses. But in wide distinction from the publication involved in Williams v. Standard-Examiner Publishing Co., supra, the book did not comment upon or criticize any action of plaintiff as a public official. Neither did it undertake to comment upon or criticize his literary productions or public addresses. Instead, its gist was to charge him with being disloyal to his country during a national crisis. It attacked him personally. It assailed his personal character in a vital manner, quite apart from his literary productions or public addresses. And upon full consideration we think that under recognized canons of controlling law, a publication of that kind is not privileged. Triggs v. Sun Printing & Publishing Association, 179 N.Y. 144, 71 N.E. 739, 66 L.R.A. 612, 103 Am.St.Rep. 841, 1 Ann.Cas. 326; Brown v. New York Evening Journal, 143 Misc. 199, 255 N.Y.S. 403, affirmed 235 App.Div. 840, 257 N.Y.S. 903; Newell Slander and Libel (4th ed.) 547–551; Restatement, Tort §§ 606, 609; 33 Am.Jur. 159; 53 C.J.S., Libel and Slander, § 134 pages 221–222.

■ One further question calls for discussion. As already indi:ated, plaintiff relied in the main upon the book as charging him with being disloyal to the United States and therefore constituting actionable libel. But, having reference to the occasion on which plaintiff and defendant met and became personally acquainted in Salt Lake City, the book described plaintiff as being a small, rotund man with a bald dome and round face; as having small, beady eyes; as peering from behind rimmed glasses; and as being definitely of the single-track, uncompromising zealot type. And in its instructions to the jury, the court submitted ridicule of physical appearance as an element of libelous matter for which damages might be awarded. Section 62—2—2, Utah Code Annotated 1943, defines libel as "a defamation, expressed either by printing or by signs or pictures or the like, tending * * * to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule." Construed in the light most critical of plaintiff, the book merely stated in respect of his physical appearance that he was small and rotund in stature; that he was baldheaded; that he had a round face; that his eyes were small in size and beady in appearance; that he wore rimmed glasses; and that he was of the single-track, uncompromising zealot type. Whether untrue or otherwise, these statements were not reasonably calculated to subject plaintiff to public ridicule; and therefore it was error to submit to the jury ridicule of personal appearance as an element of damages for which plaintiff might recover.

The judgment is reversed and the cause remanded.

HUXMAN, Circuit Judge (specially concurring).

I concur in the conclusions of Judge Bratton that the admission of those portions of the publications relating to Stokes' personal appearance constitutes reversible error and requires a reversal of the judgment. I am, however, of the further opinion that all of the publications complained of are qualifiedly privileged. It is true, as stated in Judge Bratton's opinion, that Stokes was not a public official, that he was not a candidate for office, nor did he hold a managerial position in a public institution. But I do not understand the authorities to hold that such is necessary to invest publications concerning one with a qualified privilege. Stokes had entered the public arena at a time when we were at war. He printed and distributed a large number of publications attacking the President, his cabinet, our national policies as relating to the war effort, the Governor of the State of Utah, and the Senators of that State. A writer or public speaker invites criticism of what he writes or speaks, and the doctrine of qualified privilege applies. 33 Am.Jur. Par. 164; 53 C.J.S., Libel and Slander, § 134, page 217. Appellant did not call Stokes a Nazi. It is true that the inference from what he said about him and his activities and connections was that he belonged to Nazi or Fascist groups. But all appellant

did was to write about Stokes' public activities and connections with various groups and movements. Writing about one's public activities of necessity carries implications of a personal nature. Although his private character is not subject to attack, the personal implications or qualities flowing from one's public activities or writings are open to such analysis or conclusions as an honest and intelligent man might make. Berg v. Printers' Ink Pub. Co., D.C., 54 F.Supp. 795.

As stated in Sidis v. F-R Pub. Corp., 2 Cir., 113 F.2d 806, 809, 138 A.L.R. 15,

"At least we would permit limited scrutiny of the 'private' life of any person who has achieved, or has had thrust upon him, the questionable and indefinable status of a 'public figure'."

One who by his activities, writings or spoken language attempts to influence public opinion in any way is subject to free and honest criticism of his efforts by members of the public. Restatement of Law of Torts, Vol. 3, Par. 610, page 292. The fact that a publication of one's public activities and connections tends to reflect upon him personally, does not destroy the qualified privilege thereof.[1]

I would accordingly base the reversal upon the additional ground that the publications were conditionally privileged and that it was error to fail to give the proper instructions relating thereto.

PHILLIPS, Circuit Judge (dissenting).

I dissent for the reason that in my opinion, the ground upon which the reversal is based was not raised in the trial court, and was not argued in the appellant's brief here.

Section 62—2—2, Utah Code Annotated, 1943, defines libel as follows: "A libel is a malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule."

The language purporting to describe the physical characteristics or natural defects of the plaintiff, Stokes, was pleaded in his second amended complaint. A motion to strike was lodged against that complaint, but that language was not challenged. The exception to the instruction was not on the ground that such language would not expose Stokes to ridicule, but on the ground that there was no basis in the evidence for finding that the defendant "had maliciously ridiculed" Stokes. In other words, that there was no basis in the evidence for a finding of malice, not that the language would not expose Stokes to ridicule.

In the brief, counsel for the defendant do not argue that the language used would not expose Stokes to ridicule, but that truth was erroneously excluded as a defense, and that the publication of the natural defects of a person do not constitute libel unless they are "either false or grossly exaggerated."

It seems clear to me that truth is no defense under the statute to the publication of natural defects of a person which thereby exposes such person to ridicule. The words "publish the natural defects of one" clearly import the publication of the truth. The statute makes it a libel so to do if the publication is malicious, and the language will expose the person concerning whom the words are published to contempt or ridicule.

The error, if any, is not, in my opinion, of such a substantial character that we should notice it where it was not properly brought to the attention of the court at the trial below, nor argued here.

Accordingly, I would affirm.

---

[1] In addition to the cases cited above, see also Potts v. Dies, 77 U.S.App.D.C. 92, 132 F.2d 734; McLean v. Merriman, 42 S.D. 394, 175 N.W. 878; 33 Am.Jur., Libel and Slander, Par. 176, page 170; Restatement, Law of Torts, Vol. 3, Par. 606, page 278.